**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | |
|---|---|
| **PAMELA HALL,** | |
| Plaintiff, | |
| v. | Civil Action No. 7:12-CV-12 (HL) |
| **TIFT COUNTY HOSPITAL AUTHORITY d/b/a TIFT REGIONAL MEDICAL CENTER, ELLEN EATON, in her official capacity as Director of Human Resources and in her individual capacity, and APRIL DUKES, in her official capacity as Director of ER/ICU Nursing Services and in her individual capacity,** | |
| Defendants. | |

**ORDER**

This case is before the Court on Defendants= Motion for Summary Judgment (Doc. 21). Plaintiff has filed a response, and Defendants have filed a reply. Upon review of the briefs, depositions, affidavits, and other evidence submitted, Defendants=Motion for Summary Judgment is granted.

**I.    SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "The moving party bears 'the initial responsibility of informing the . . . court

of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S.Ct. 2505 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249–50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Trial Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no genuine issue for trial." <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S.Ct. 1348 (1986))."If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50 (internal citations omitted).

## II.   FACTS

Viewed in the light most favorable to Plaintiff, the Court finds the material facts for purposes of summary judgment to be as follows.[1]

Defendant Tift County Hospital Authority is a governmental entity created under state statute. It operates the Tift Regional Medical Center ("TRMC"). TRMC provides hospital services for twelve counties in south central Georgia. Plaintiff, a Registered Nurse, became employed at TRMC on February 6, 2006.

During her employment with TRMC, Plaintiff performed the duties of both a charge nurse and a relief nursing supervisor. A charge nurse oversees the unit, takes care of patient flow issues, and assigns staff to certain patients. The charge nurse also has the authority to impose minor discipline, such as speaking with subordinate employees privately. (Deposition of Pamela Hall, pp. 49-50). A relief nursing supervisor handles all of the call-ins, oversees all of the floors,

---

[1] Unless otherwise noted, the facts are undisputed and are taken from Defendants' Statement of Material Facts (Doc. 23).

handles staffing, handles patient problems that the charge nurse is unable to address, calls back doctors and operating room teams, and helps with anything that the charge nurse cannot solve. Serving shifts as a charge nurse or relief nursing supervisor resulted in increased pay for Plaintiff.

As an employee, Plaintiff was governed by the TRMC Employee Handbook. The handbook contains a diversity policy of which Plaintiff was aware that states in part as follows:

> TRMC will provide for all employees an environment that is conducive to open discussion free of intimidation, harassment, and discrimination. Slurs, jokes, verbal or written, and graphic conduct relating to individuals [sic] differences will not be tolerated. Such conduct will be considered as interfering with an individual's work performance and/or creating an intimidating, hostile or offensive work environment.

(Hall Dep., Ex. 25).

Plaintiff also had access to the TRMC locker room. The locker room is accessible only to TRMC employees. The lockers are used by employees to store private possessions and personal items during their shifts. Each employee locker has either the employee's name or a picture on the front, and is used by a specific employee for the duration of his employment with TRMC. The employees are aware of which locker belongs to which employee.

Plaintiff met Amanda Dix, a staff nurse at TRMC, in 2006. (Declaration of Pamela Hall, ¶ 2). They have worked together since then as nurses at TRMC.

(Id.) Plaintiff and Dix were social friends and their families even vacationed together. (Hall Decl., ¶ 4). But in 2009, Plaintiff and Dix's friendship was damaged after Plaintiff accused Dix of having an affair with Plaintiff's husband. (Deposition of Amanda Dix, p. 20). Dix then told Plaintiff that she (Dix) was a lesbian. (Dix Dep., pp. 20-21; Hall Decl., ¶¶ 5-6). Plaintiff told Dix that she could not be a part of Dix's lifestyle. (Dix Dep., p. 26). The affair allegation and Dix's revelation that she was a lesbian harmed their friendship, though they did talk about trying to rekindle their friendship. (Dix Dep., pp. 22-23, 29-30). At all times relevant to this case, Dix identified herself as a lesbian. (Dix Dep., p. 26).

Plaintiff, who is a Baptist, obtained a pamphlet entitled "How Should Christians Respond to 'Gay' Marriage?" In July 2011, Plaintiff placed the pamphlet in Dix's locker at a shift change. (Hall Decl., ¶ 11). Plaintiff attached a small piece of paper to the front of the pamphlet with a paper clip. On the piece of paper Plaintiff wrote that she felt led to give the pamphlet to Dix. Plaintiff placed the pamphlet and note in the very back of Dix's locker. Because Dix had said she was a Christian, Plaintiff felt a duty to tell her that, based on Christian teachings, the practice of homosexuality was a mistake and would harm Dix. (Hall Decl., ¶ 7).

Dix found the pamphlet in her locker, read the attached note and title of the pamphlet, and then threw the pamphlet in the trash. Dix was made angry,

disgusted, humiliated, and offended by the cover of the pamphlet. Plaintiff, along with other employees, was in the locker room when Dix found the pamphlet. Plaintiff told Dix that she wanted Dix to read the pamphlet in private. Dix did not open or read the pamphlet or otherwise respond to Plaintiff.

Rose Powell, a nurse manager, was told about the pamphlet incident and that Dix had been offended. Powell contacted Dix via telephone to discuss whether Dix wanted TRMC to speak with Plaintiff about the pamphlet. Dix told Powell that she was okay and would handle it. (Dix Dep., p. 42). Dix thought Plaintiff probably would not say anything else because Plaintiff saw how upset the pamphlet made Dix and how Dix was offended by the pamphlet. (Id.) Dix then said that if anything else happened, she would let Powell know. (Id.)

Plaintiff was concerned that Dix would not read the pamphlet, so she sent Dix an email dated July 28, 2011 through the TRMC email system. The July 28 email reads as follows:

> Mandy, Caleb told me you talked with him about the little booklet I left you. I had not told anyone about that I was leaving that up to you. I saw that book in Kentucky when we went to the creation museum. I don't want to hurt your feelings but I felt led to leave that for you and I would not be a true friend if I ignore the responsibility that God has left for his children to share the message and hold each other accountable. Even me. I would hope that someone would hold me accountable for when I'm not in the right walk with God.  I actually wish that someone would have sat me down long ago and really opened me [sic] eyes to the way I was living. It was not pleasing to God. What feels good and what makes up [sic] happy is not always the right thing to do. Sodomy is a sin, gay people live in

sin. It is not about self gratification. I have true joy that can only come from being in God's grace. We will all die. We will stand before the Lord and he will hold us accountable for lack of witnessing and other sins. I won't harp on this issue but I will pray for you still and myself because I love you and I want you to be there with me in heaven. When we are in God's will we will WANT to live right and live for him and do what the Bible says and that is to go and tell! Everything else is not important. I hope I have not made you mad but I will leave you alone. Just know that I'll be on my knees for all my friends. I'm still working on some others. It burdens me to think that many will not be with us for eternity. Brandy has often said that there is a special place in heaven for nurses. There is not. I hope she comes to know the Lord one day. There is only one way to heaven. I love ya girl.

(Hall Dep., Ex. 22).[2]

Dix did not read the email until several days after Plaintiff sent it because Dix had been off work and did not necessarily check her email every day. (Dix Dep., p. 39). She finally read it on August 12, 2011. Dix initially did not want her supervisors to do anything about the email, but changed her mind after thinking more about the email. (Dix Dep., p. 47). Dix was tired of being harassed at work, so on August 12, she forwarded the email to her supervisors, Rose Powell and Defendant April Dukes, Director of the Intensive Care Unit. (Dix Dep., pp. 39-40). Dix considered the email to be harassing "because [Plaintiff] tells me that I'm going to hell in [the email] and that I'm living in sin and that gay people are going

---

[2] It is undisputed that TRMC employees often used the TRMC email system to send and receive messages about matters unrelated to work, including religion, politics, and sports.

to hell." (Id.) At times, Plaintiff worked as a supervisor over Dix. After the pamphlet and email, Dix did not feel comfortable with Plaintiff supervising her during an assigned shift. Dix wanted Defendant Dukes to handle the situation with Plaintiff. (Dix Dep., p. 45).

After reading Plaintiff's email, Defendant Dukes believed that the email could be read as offensive to Dix. Pursuant to TRMC protocol, Defendant Dukes forwarded the email to Defendant Ellen Eaton, Human Resources Administrator, and Diane Patrick, Vice President of Patient Care Services and Chief Nursing Officer, for further direction.

The email was forwarded by Defendant Dukes to Defendant Eaton and Patrick on the afternoon of August 12, a Friday. (Deposition of April Dukes, p. 111). Plaintiff was scheduled to work that night. (Dukes Dep., p. 111). Defendant Dukes called Powell and told her to call Plaintiff and tell her that she would be placed on leave until a complaint was investigated. (Dukes Dep., p. 111). While standard practice at TRMC was for such a suspension to be with pay, Plaintiff was in fact suspended without pay for four shifts and had to use vacation hours to make up the time. (Hall Decl., ¶ 20).

Defendants Eaton and Dukes decided to hold a meeting with Plaintiff to talk with her and learn her version of the events. Both Defendants also knew at this time about the pamphlet Plaintiff left in Dix's locker. The day before the

meeting with Plaintiff, Defendants Dukes and Eaton and Diane Patrick had a discussion about what to do. (Dukes Dep., p. 120). The group agreed that Plaintiff was a skilled nurse and they wanted to retain her as an employee. (Dukes Dep., p. 120). However, the group did decide that Plaintiff should not function in a supervisory capacity for at least some period of time. (Dukes Dep., pp. 122-123). That decision could be reconsidered after the probationary period. (Dukes Dep., p. 123). A counseling record reflecting certain discipline was then prepared. (Dukes Dep., p. 139).[3]

On August 16, 2011, Plaintiff met with Defendants Eaton and Dukes to discuss Dix's complaint. It was Defendant Eaton's intent during the meeting for Plaintiff to understand that she could not continue to harass co-workers on the topic of homosexuality. (Declaration of Ellen Eaton, ¶ 14). While Plaintiff understood that Defendants Eaton and Dukes were trying to tell her that she could not harass her co-workers, she believed she did not engage in any harassment. (Hall Dep., p. 106). Defendant Eaton then told Plaintiff that "we"

---

[3] The Court recognizes that Defendant Eaton testified that alternative counseling forms were prepared and that Defendants argue that no decision about discipline was made prior to the August 16 meeting. However, the Court has closely read Defendant Dukes' deposition testimony, and construing it in the light most favorable to Plaintiff, the Court reads the testimony as Plaintiff does - that the group decided prior to the August 16 meeting that Plaintiff would be put on probation and removed from any supervisory position for a period of time.

could not talk about Jesus or share "our" faith at work. (Id.)[4] Defendant Eaton testified that Plaintiff would not agree during the meeting that she could not discuss her religious beliefs with another employee once the employee said to stop, (Deposition of Ellen Eaton, p. 35), and she was concerned that Plaintiff would continue to harass Dix. (Eaton Decl., ¶ 13). Plaintiff states she did not refuse to stop communicating with Dix about same-sex marriage or homosexual practices and since July 28, 2011 has not attempted to communicate with Dix about those issues. (Hall Decl., ¶ 19).

Plaintiff then received the counseling record which was prepared after the August 15 meeting between Patrick and Defendants Eaton and Dukes. The counseling record classified the meeting as a written counseling session. (Hall Dep., Ex. 23). The specific problems listed on the form were: "Sending an electronic message to a co-worker that could be perceived as discriminatory in nature. Leaving printed material for a co-worker that could be considered discriminatory with subjects related to religion and sexual preferences while at work."[5] (Id.) Plaintiff was put on probation for six months, removed from

---

[4] Defendants Eaton and Dukes both say Eaton never made that comment.

[5] While the counseling record uses the word "discriminatory," it is clear to the Court that Defendants Dukes and Eaton actually meant that the message and material could have been perceived as harassing in nature. This distinction does not change the Court's ultimate conclusion but was worth noting.

supervisory duties, and told to refrain from discussing or using electronic media to further personal beliefs that co-workers consider discriminatory. (Id.)

Plaintiff was subsequently moved from the Emergency Department to the Intensive Care Unit, where she continues to work today as a staff nurse. She has not been put back into a supervisory position. However, in order to be considered for a supervisory position an employee must complete a position interest form and Plaintiff has not done so. (Dukes Dep., p. 124).

Other TRMC employees have been disciplined for sending offensive or harassing emails. (Eaton Decl., ¶ 8). Two employees were terminated in April of 2009 for distribution of racial, ethnic, and religious materials in the form of an email that was offensive to other TRMC employees. (Eaton Decl., Attachs. B-C). The email makes specific reference to Islam, blacks, black Muslims, and Hispanics. (Eaton Decl., Attachs. B-C). Plaintiff is not aware of any other TRMC employee who has been disciplined for sending a Christian-themed email absent a complaint of harassment or discrimination, and is not aware of any other employees who have been disciplined for expressing their religious views.

On October 14, 2011, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a Dismissal and Notice of Rights on October 21, 2011. Plaintiff filed this lawsuit on January 13, 2012. Defendants now seek summary judgment in their favor on all

four counts. The Court will address each count below, but not in the order presented in the complaint.

## III.  DISCUSSION

### A.  Title VII

In Count IV of her complaint, Plaintiff contends she was subjected to religious discrimination in violation of Title VII.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. § 2000e-2(a)(1). Plaintiff contends that she was disciplined because of her religion. She specifically contends that her brand of religious beliefs did not conform to the religious orthodoxy that Defendants followed and sought to impose.

Plaintiff's Title VII claim is a disparate treatment claim. Disparate treatment with respect to religion may be established either through direct evidence of discrimination or through circumstantial evidence that creates an inference of discrimination. Wright v. Southland Corp., 187 F.3d 1287, 1293 (11th Cir. 1999); Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). Plaintiff

here attempts to prove her discrimination claim with both direct and circumstantial evidence.

### 1.    Direct evidence

Plaintiff first contends she has presented a direct evidence case of discrimination. Direct evidence of discrimination "reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004). Direct evidence of discrimination is evidence that, "if believed, proves [the] existence of [a] fact in issue without interference or presumption." Burrell v. Board of Trustees of Ga. Military College, 125 F.3d 1390, 1393 (11th Cir. 1997). The proffered statements must both "reflect a discriminatory attitude and tie the discriminatory attitude to the relevant employment decision." Bernstein v. Sephora, Div. of DFS Group L.P., 182 F.Supp.2d 1214, 1216 (S.D. Fla. 2002) (citing Wright, 187 F.3d at 1294). Evidence that only suggests discrimination, *see* Earley v. Champion Intern. Corp., 907 F.2d 1077, 1081-82 (11th Cir. 1990), or that is subject to more than one interpretation, *see* Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1083 n. 2 (11th Cir. 1996), does not constitute direct evidence of discrimination.

Plaintiff points to the following statement by Defendant Eaton as direct evidence of religious discrimination: "[Defendant Eaton said] we could not share

13

our faith at work. We could not talk about Jesus at work. She said if someone actually came up to me and asked me about the Lord, that my response should be, you have to wait until I clock out." (Hall Dep., p. 93). But "[t]o be direct evidence, the remark must indicate that the employment decision in question was motivated by [religion]." Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1227-28 (11th Cir. 2002) (racial discrimination case). Defendant Eaton's statement does not on its face tie the employment decision (probation and removal of supervisory duties) to any alleged discriminatory attitude.

The statement from Defendant Eaton can be differentiated from the one contained in the case mentioned by Plaintiff, Dixon v. The Hallmark Companies, Inc., 627 F.3d 849 (11th Cir. 2010), where the plaintiffs alleged their supervisor said upon terminating them from employment, "You're fired, too. You're too religious." Id. at 853. Certainly that statement, if believed, proves a discriminatory motive without inference. *See also* Earley, 907 F.2d at 1081 (holding that a management memorandum saying, "Fire Early-he is too old" constituted direct evidence of discrimination); Haynes v. W.C. Caye & Co. Inc., 52 F.3d 928, 930 (11th Cir. 1995) (finding direct evidence of discrimination where the decisionmaker stated that women were simply not tough enough to do the job from which the plaintiff had been removed and that it would require a man to do the job); *contra* Murdick v. Catalina Marketing Corp., 496 F.Supp.2d 1337, 1349-

1350 (M.D. Fla. 2007) (statement that plaintiff was evil because he was a Buddhist did not constitute direct evidence of discrimination because the statement does not prove the supervisor would take adverse action based on his negative feelings).

Defendant Eaton's statement is not the sort of blatant remark "whose intent could be nothing other than to discriminate on the basis of [religion]" in connection with the employment action taken. Dixon, 627 F.3d at 854. Instead, a reasonable juror would have to draw an inference that because Defendant Eaton holds a discriminatory animus towards Christians, she disciplined Plaintiff. If the evidence truly was direct evidence of discrimination the jury would not have to make such an inference. Thus, the Court finds that Plaintiff has not established a direct evidence case of disparate treatment.

### 2.    Circumstantial evidence

As Plaintiff has not demonstrated direct discrimination, the Court must consider whether she has identified sufficient circumstantial evidence of discrimination. This means the Court must conduct an analysis under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973).

Under the McDonnell Douglas test, the plaintiff bears the initial burden of establishing a prima facie case. Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). If the plaintiff "fails to satisfy any one of the elements of a

prima facie case," summary judgment against the plaintiff is appropriate. Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1433 (11th Cir. 1998).

However, if a plaintiff establishes a prima facie case, the employer must then articulate a legitimate, nondiscriminatory reason for the challenged employment action. Pennington, 261 F.3d at 1266. This burden is "exceedingly light;" the defendant must merely proffer a non-discriminatory reason, not prove it. Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1142 (11th Cir. 1983). "The defendant need not persuade the court that it was actually motivated by the proffered reasons. . . .It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id.

If the employer can give an appropriate explanation, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's explanation is merely a pretext. Id. A plaintiff cannot establish pretext by simply demonstrating facts that suggest discrimination, but must specifically respond to the employer's explanation and rebut it. Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1309 (11th Cir. 2007). Pretext evidence is that which demonstrates "such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation omitted).

The Court must first consider whether Plaintiff has established a prima facie case of discrimination. To establish a prima facie case of disparate treatment in a religious discrimination case, a plaintiff must show: (1) she is a member of or practices a particular religion; (2) she is qualified to perform the job at issue; (3) she has suffered an adverse employment action; and (4) someone outside the protected class of which she is a member was treated differently. Wilshin v. Allstate Ins. Co., 212 F.Supp.2d 1360, 1371 (M.D. Ga. 2002); Gunning v. Runyon, 3 F.Supp.2d 1423, 1428 (S.D. Fla. 1998).

Defendants focus only on the fourth prong of the prima facie test. Thus, the Court finds the first three prongs to be established. Defendants argue that Plaintiff cannot make a prima facie case of disparate treatment because she has not presented any evidence that members outside her protected class were treated differently by TRMC following receipt of complaints of harassment. In other words, Plaintiff has not shown that any non-Christians were treated differently by TRMC.

Plaintiff does not address Defendants' fourth prong argument in her response. Instead she just makes a conclusory statement that the methods of proving a prima facie case are not fixed and moves on into pretext. But the Court cannot just skip over the prima facie case in its analysis. Defendants are correct that Plaintiff has not produced evidence of someone outside the Christian religion

who was treated differently from her. The question is whether Plaintiff was discriminated against <u>because of</u> her religion - was she discriminated against because she is a Christian? Without producing evidence of a non-Christian employee in the same job being treated differently after engaging in the same activity, Plaintiff cannot establish a prima facie case.[6] *See also* <u>Patterson v. Indiana Newspapers, Inc.</u>, 589 F.3d 357, 365-66 (7th Cir. 2009) (plaintiff did not establish a prima facie case of religious discrimination because she did not present evidence of similarly situated employees outside of the protected class who were treated more favorably); <u>Mohamed v. Public Health Trust of Miami-Dade County</u>, No. 09-21235-CIV, 2010 WL 2844616, at * 9-10 (S.D. Fla. 2010) (Muslim plaintiff failed to establish a prima facie case of religious discrimination because he failed to identify any similarly situated non-Muslim who was treated more favorably for the same actions); <u>Postell v. Greene County Hospital Auth.</u>, No. 3:05-CV-73 (CDL), 2007 WL 1876014, at * 6 (M.D. Ga. 2007) (defendant was entitled to summary judgment on religious discrimination claim when Christian plaintiff failed to present evidence that plaintiff was treated differently than similarly situated employees outside her protected class).[7]

---

[6] Plaintiff also has failed to present a "convincing mosaic of circumstantial evidence" of discrimination sufficient to get her past summary judgment on the Title VII claim. <u>Smith v. Lockheed-Martin</u>, 644 F.3d 1321, 1328 (11th Cir. 2011).

[7] The case from the Eastern District of Pennsylvania cited by Plaintiff in support of her Title VII claim, <u>Gadling-Cole v. West Chester University</u>, 868 F.Supp.2d 390 (E.D. Pa.

Also, Plaintiff attempts to raise a "mixed motive" theory for the first time in her response brief to Defendants' motion for summary judgment. Plaintiff did not raise the mixed motive issue in her complaint, and the section in her response brief, which is one sentence long, is not sufficient to provide Defendants with adequate notice of the new claim or to amend the original complaint. *See* Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004); Keaton v. Cobb County, Ga., No. 08-11220, 2009 WL 212097, at * 10 (11th Cir. 2009). Thus, the Court will not address a mixed motive theory at this stage of the proceedings.

Because Plaintiff has not established a prima facie case of religious discrimination, her Title VII claim fails. The Court grants summary judgment in Defendants' favor on Count IV of Plaintiff's complaint.

## B.    Equal Protection

In Count III of her complaint, Plaintiff alleges an equal protection violation. "The Equal Protection Clause of the Fourteenth Amendment generally requires government entities to treat similarly situated individuals alike." Alford v. Consolidated Gov't of Columbus, Ga., 438 F.App'x 837, 839 (11th Cir. 2011) (citing Campbell v. Rainbow City, Ala., 434 F.3d 1306, 1313 (11th Cir. 2006)). Two kinds of equal protection claims exist: "(1) [the plaintiff] is a member of a

_____

2012), is not persuasive because that case was decided on a motion to dismiss, not a motion for summary judgment.

protected class similarly situated to members of an unprotected class and was treated differently from the unprotected class; or (2) he belongs to a 'class of one' and was intentionally treated differently from others similarly situated without any rational basis." Mayer v. Gottheiner, 382 F.Supp.2d 635, 651 (D.N.J. 2005) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990) and Village of Willowbrook v. Olech, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)).

Defendants contend that Plaintiff is asserting a "class of one" equal protection claim, as, in their opinion, she claims she was intentionally treated differently from others similarly situated and there was no rational basis for the treatment. But as Defendants point out in their motion, the Supreme Court has held that a class of one equal protection claim is not cognizable in the context of public employment. Engquist v. Oregon Dep't of Agric., 553 U.S. 591, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008).

In response, Plaintiff contends that she is not alleging a class of one claim, and therefore, Engquist is not applicable. Instead, she asserts she was discriminated against because of her membership in a protected class. But to succeed on an equal protection claim, Plaintiff has to show more than just being a member of an identifiable group. She must also show that she was subjected to differential treatment from others similarly situated and that the difference in

treatment was based on her membership in that group. <u>Glenn v. Brumby</u>, 724 F.Supp.2d 1284, 1296 (N.D. Ga. 2010) (citing <u>Pers. Adm'r of Mass. v. Feeney</u>, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)). The problem here, as with her Title VII claim, is that Plaintiff has presented no evidence that she was subjected to different treatment from similarly situated persons in an unprotected class.

Thus, even assuming Plaintiff is truly not making a class of one claim, which would fail because of <u>Engquist</u>, her equal protection claim still fails. Without evidence of a comparator or someone similarly situated who was treated differently, Plaintiff cannot establish an equal protection violation.

Defendants are entitled to summary judgment on Count III of Plaintiff's complaint.

**C.    First Amendment - Free Speech**

In Count I of her complaint, Plaintiff alleges that Defendants' actions violated her free speech rights under the First Amendment. Though not specifically stated in the complaint, in reviewing the summary judgment briefs it appears that Plaintiff is asserting a First Amendment retaliation claim, in that she was disciplined for speaking out about her religious beliefs. Accordingly, the Court will analyze Count I as a retaliation claim.

A state may not demote or discharge a public employee in retaliation for protected speech. The Eleventh Circuit has developed a four-part test to determine whether an employee suffered such retaliation. First, the Court must determine whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern. If so, the Court must weigh the employee's First Amendment interests against the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. If the employee prevails on the balancing test, she must prove to the factfinder that her speech played a substantial part in the government's decision to demote or discharge her. Finally, if the employee shows that the speech was a substantial motivating factor in the employment decision, the state must prove by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct. Morgan v. Ford, 6 F.3d 750, 753-54 (11th Cir. 1993) (quotation marks, citations, brackets, and ellipsis omitted); Gonzalez v. Lee County Hous. Auth., 161 F.3d 1290, 1295 (11th Cir. 1998). This four-part test is known as the Pickering analysis. Pickering v. Bd. of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

"The threshold question of whether an employee's speech may be fairly characterized as constituting speech on a matter of public concern is a question of law." Deremo v. Watkins, 939 F.2d 908, 910 (11th Cir. 1991). In their motion,

Defendants argue that they are entitled to summary judgment on Plaintiff's free speech claim because she was not speaking on a matter of public concern, and therefore, the speech was not protected by the First Amendment.

For an employee's speech to rise to the level of public concern, it must relate to a matter of political, social, or other concern to the community. The Court must decide whether the purpose of Plaintiff's speech was to raise issues of public concern or to further her own private interest. Morgan, 6 F.3d at 754. In determining whether an employee's speech touched on a matter of public concern, the Court looks to the content, form, and context of the statement, the employee's attempts to make the concerns public, and the employee's motivation in speaking. *See* Connick v. Myers, 461 U.S. 138, 147-48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); Morgan, 6 F.3d at 754; Deremo, 939 F.2d at 910-11.

Defendants argue that after applying the foregoing factors, it is clear that Plaintiff did not speak out on a matter of public concern. The pamphlet was placed in the very back of Dix's locker located in a private locker room accessible only to TRMC employees. Plaintiff knew it was Dix's locker as it had either her name or picture on it. Plaintiff attached a private note to the pamphlet directed only to Dix, and later told Dix that the pamphlet was for Dix to read in private. As for the email, it also was not published to others. It was sent to Dix alone. The email specifically said Plaintiff had not mentioned the pamphlet to anyone else. In

Defendants' opinion, the pamphlet and email were both private speech made for personal reasons, and thus not protected by the First Amendment.

Plaintiff argues in response that her speech on the issue of homosexuality and gay marriage is a matter of public concern. She further states that speech can still be protected if delivered in private. It need not be stated to a public or widespread audience. Further, Plaintiff states, the speech did not relate to any issue involving the business of TRMC, but instead she was expressing her opinion on a public topic. In Plaintiff's view, the fact that she communicated with Dix in a private manner does not preclude a finding that the speech related to a matter of public concern.

Plaintiff relies heavily on a case from the Northern District of Georgia in support of her argument that her speech should be deemed to have been on a matter of public concern. But the case referenced, Dombrowski v. Federal Aviation Administration, Civil Action No. 1:06-CV-1444-BBM (N.D. Ga. 2008), is not binding on this Court and is distinguishable on its facts from the case currently pending. Dombrowski involved a situation where the plaintiff made comments in response to certain statements from a co-worker which "constituted an invitation to discuss the propriety of ordaining homosexual clergy." Id. at 24. Notably, the district court found that the plaintiff's statements with regard to homosexuality "were hardly unsolicited attempts to affect anyone's religious

beliefs." Id. Here, on the other hand, there was no conversation between Plaintiff and Dix. Certainly Dix did nothing that could be construed as an invitation for Plaintiff to discuss homosexuality or gay marriage with her. Instead, Plaintiff was the instigator and was clearly motivated by a desire to evangelize. The Court does not find Dombrowski to be persuasive on this issue.

While it is true that speech on a matter of public concern does not lose its public character solely because it is privately expressed, a failure to make the public aware of the issue can undermine its public nature. See Kurtz v. Vickery, 855 F.2d 723, 729 (11th Cir. 1988) (stating that "Kurtz's profession of public concern loses force when it is considered that he took no affirmative steps . . . to inform the public at large about the problems with which he was so gravely concerned.") As noted above, the employee's motivation and his efforts to communicate the concerns to the public are relevant considerations. Id.

Further, the mere fact that the subject matter of the expression is one in which the public might have a substantial interest, such as homosexuality or gay marriage, is not dispositive. Morgan, 6 F.3d at 754. The Court is most certainly aware that homosexuality and gay marriage have public concern implications. But in this case, Plaintiff's motivation was not to bring these issues to the public's attention. Instead, Plaintiff was proselytizing to a former friend in a private manner. Plaintiff's statement that she wanted Dix to read the pamphlet in private

shows that her expression was not intended to be publicly aired and was not meant to be a matter of public concern. Plaintiff's July 28 email confirms this. There was no effort whatsoever by Plaintiff to communicate her concerns to the public. Plaintiff was doing nothing more than speaking for herself by giving her personal opinion. Her motivations were completely personal in nature.

"If the relevant speech was motivated by personal concerns instead of public concerns then it is not protected by the First Amendment in this context." Johnson v. Clifton, 74 F.3d 1087, 1092 (11th Cir. 1996). Under the First Amendment standards promulgated by the appellate courts, the Court finds that Plaintiff's speech does not satisfy the first prong of the Pickering test, and therefore, her First Amendment free speech claim fails.

Defendants are entitled to summary judgment on Count I of Plaintiff's complaint.

### D.    First Amendment - Free Exercise of Religion

Plaintiff's final claim is that by disciplining her for expressing her sincerely held religious beliefs, Defendants' actions deprived her of the free exercise of religion under the First Amendment.

The First Amendment's prohibition on the making of a law prohibiting the free exercise of religion applies to the states through the Fourteenth Amendment. *See* Cantwell v. Connecticut 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213

(1940). The "free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." Cornerstone Christian Schs. v. Univ. Interscholastic League, 563 F.3d 127, 135 (5th Cir. 2009) (quoting Employment Div., Dep't of Human Res. of Oregon v. Smith, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)). But "[w]hile the First Amendment provides absolute protection to religious thoughts and beliefs, the free exercise clause does not prohibit governments from validly regulating religious conduct." Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 649 (10th Cir. 2006). Neutral laws of general applicability are constitutional, even if they incidentally burden religious beliefs or practices. Employment Div., 494 U.S. at 878-79.

"A law is neutral so long as its object is something other than the infringement or restriction of religious practices." Grace United Methodist Church, 451 F.3d at 649-50 (citing Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (a "law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context")). Here, the TRMC diversity policy which contains the anti-harassment provision under which Plaintiff was disciplined is neutral. Certainly the object of the policy is something other than the restriction of religious practices. It is also generally applicable and applies

equally to all TRMC employees, regardless of religion. "Neutral rules of general applicability ordinarily do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief." Axson-Flynn v. Johnson, 356 F.3d 1277, 1294 (10th Cir. 2004). Since the diversity policy is neutral and generally applicable, it must simply be rationally related to a legitimate government end to pass muster. TRMC's interest in the effective operation of the hospital provides a rational basis for the rule.

The question before the Court is whether Plaintiff has adduced evidence from which a reasonable jury could conclude that her ability to practice her religion was substantially burdened. The Court finds that she has not. Any burden on Plaintiff's right to freely exercise her religion was imposed by the implementation of a neutral policy of general applicability and therefore does not infringe upon the First Amendment. The Court disagrees with Plaintiff's contention that Defendants punished her for following a brand of Christianity they found unacceptable. The evidence simply does not support that proposition.

Defendants are entitled to summary judgment on Count II of Plaintiff's complaint.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment (Doc. 21) in its entirety.

**SO ORDERED**, this the 10th day of June, 2013.

*s/Hugh Lawson*_____
**HUGH LAWSON, SENIOR JUDGE**

mbh